**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

HENRY L. POITRAS,

Plaintiff,

v.

CHARITY CLARK, Attorney General of
Vermont, in her Official and
Personal Capacities,

Defendant.

Case No. 2:26-cv-234

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Henry Poitras asks the Court to halt a state investigation into a highly realistic video that appears, on its face, to implicate Vermont's new deepfake disclosure law. Poitras admits he made the video, admits he posted it publicly, and admits he intends to keep making videos just like it. Poitras is not entitled to the extraordinary relief he seeks.

Poitras is unlikely to succeed on the merits, because Act 75 is constitutional. The Act regulates only fraudulent and deceptive speech without regard to the speaker's ideology or message. And it achieves that regulation via a simple disclosure requirement, not a ban. Its safe harbors for satire and news, its knowledge and intent requirement, and its narrow ninety-day pre-election window ensure that speakers remain free to say what they wish about Vermont's candidates, so long as fraudulent portrayals of a candidate come labeled as what they are. The Attorney General's civil investigative demand likewise is narrowly tailored to Vermont's interest in protecting voters from deceptive deepfakes.

Poitras fares no better on the remaining preliminary injunction factors. He fails to explain how the Act or the CID materially restricts his ability to speak about Vermont politics, or why

1

the public interest would be served by an injunction preventing the Attorney General's Office from investigating a potential effort to deceive Vermont voters in the run-up to an election. The Court should deny Poitras's requested injunction.

## BACKGROUND

### I.    Statutory Overview

In recent years, technological advances have made it possible to create near-facsimiles of specific individuals' voices and likenesses. For instance, during the 2024 New Hampshire presidential primary election, a political consultant executed robocalls using a "deepfake" of a candidate's voice—a near-facsimile created with artificial intelligence—to dupe thousands of voters statewide into believing they were speaking with the candidate himself. *See* Shannon Bond, *A Political Consultant Faces Charges and Fines for Biden Deepfake Robocalls*, NPR (May 23, 2024), https://perma.cc/Y6WY-QWSS. Vermont, like many other states across the country,[1] responded to this growing threat to public discourse by enacting a law to govern the use of such deepfakes in connection with elections.

The Legislature worked on the bill over the course of the 2025 and 2026 legislative sessions. In so doing, it considered the developing record of deepfake laws in other states. *See* National Conference of State Legislatures, *Deepfakes in Elections* (Apr. 16, 2025), https://perma.cc/U6LC-B8CW; National Conference of State Legislatures, *The Federal and State Legislative Landscape on the Use of Artificial Intelligence in Elections* (Sept. 12, 2024), https://perma.cc/XUV7-3P5J. The Legislature weighed the competing considerations and

---

[1] *See, e.g.*, Ala. Code § 17-5-16.1; Ariz. Rev. Stat. Ann. § 16-1024; Idaho Code § 67-6628A; Ky. Rev. Stat. Ann. § 117.322; Minn. Stat. § 609.771; N.Y. Elec. Law § 14-106; N.D. Cent. Code § 16.1-10-04.2; S.D. Codified Laws §§ 12-26-32 to 12-26-37; Wash. Rev. Code §§ 29B.35.010 *et seq*.

enacted "An act relating to the use of synthetic media in elections," 2026 Vt. Acts & Resolves No. 75.

The Act requires people who share deepfakes to disclose that the content is not real. Specifically, the law requires any person who knowingly distributes "deceptive and fraudulent synthetic media" within 90 days of an election to include a disclosure stating that the media was digitally generated manipulated. Vt. Stat. Ann. tit. 17, § 2032(a). For a video, the disclosure must "appear for the full duration of the video." *Id.* § 2032(a)(1). At no point does the Act prohibit or restrain the publication of deepfakes or any other media.

The Act defines "synthetic media" broadly to include any image, audio recording, or video "created or intentionally manipulated with the use of digital technology, including artificial intelligence." *Id.* § 2031(2). The Act defines "deceptive and fraudulent synthetic media" as media that "appears to a reasonable person to be a realistic representation" of an individual and either "injures the reputation of a political candidate," *id.* § 2031(1)(A), or "attempts to unduly influence the outcome of an election . . . by providing materially false information to voters," *id.* § 2031(1)(B).

The Act contains several safe harbors. Relevant here, it exempts individuals who produce or distribute "satire or parody" from the disclosure requirement. *Id.* § 2032(b)(3). The Act also exempts broadcasters and news outlets that use deepfakes as part of publications, provided they acknowledge the questionable authenticity of such content. *Id.* § 2032(b)(1)-(2).

The Act creates two primary enforcement mechanisms. First, it authorizes fines for violations and permits an injured candidate to seek injunctive or other equitable relief against covered publication or distribution. *Id.* § 2033(a)-(b). Second, and relevant here, the Act grants enforcement authority to the Attorney General and the State's Attorneys. *Id.* § 2041. That

includes the authority to investigate suspected violations through civil investigative demands compelling sworn testimony and document production. *Id.* § 2042. Any materials produced in response are confidential and may not be disclosed to non-law enforcement personnel, other than disclosures in connection with civil enforcement actions to remedy violations of the Act. *Id.* § 2042(a)(4). The Act requires the Attorney General to notify the subject of the investigation in writing that "a knowing and intentional violation of this chapter is subject to criminal prosecution." *Id.* § 2042(a)(3). Any person aggrieved by a civil investigation under Act 75 may petition for expedited relief in the Superior Court in the county where he resides. *Id.* § 2042(d).

The Act creates several tiers of fines, each tailored to address different types and degrees of wrongdoing. The Act imposes a base fine of "not more than $1,000.00" for a first violation. *Id.* § 2033(a). The statute authorizes higher fines for violations where certain aggravating factors are present: up to $5,000 for violations committed with intent to cause violence or bodily harm, up to $10,000 for a repeat violation within five years, and up to $15,000 where both aggravating factors are present. *Id.* § 2033(a)(1)-(3).

## II.    Factual Background

Plaintiff, Henry Poitras, is a Vermont resident who publishes digital content under the pseudonym "Planet Hank." Compl. ¶ 21 (ECF No. 1). Poitras admits to using "artificial intelligence and other digital tools" to generate his content, and avers that he "intends to continue to do so in the future." *Id.*

On June 7, 2026, Poitras posted a short video to his various social media accounts entitled "Mark Helps Vermont Take Out The Trash." Compl. ¶ 27. The video contains "realistic" depictions of Representative Becca Balint, Vermont's representative in the U.S. Congress, and Mark Coester, a candidate running in the Republican primary hoping to take on Rep. Balint. Compl. ¶¶ 2, 4. The video opens with a closeup of Rep. Balint that is realistic and takes up most

of the screen, containing detailed facial features and even a congressional pin on her lapel. Compl. ¶ 2. The remainder of the video includes negative depictions of Rep. Balint and culminates in a scene depicting a photorealistic representation of Mr. Coester grabbing a photorealistic depiction of Rep. Balint with an excavator and dropping the Congresswoman into a dumpster. Compl. ¶ 27. Nowhere and at no point in the video does there appear any disclosure that it was created using synthetic media. The video garnered tens of thousands of views. Compl. ¶¶ 27-28.

On June 12, 2026—five days after the video was posted—the Vermont Attorney General's Office ("AGO") sent Poitras a civil investigative demand (CID) to investigate his potential noncompliance with Act 75. Compl. ¶ 44. The CID states that the AGO had a "reasonable basis to believe" that Poitras had violated Act 75. Compl. ¶ 45. The CID poses fifteen questions, most of which could be answered with simple "yes" or "no" responses. Compl. Ex. A. The questions seek basic information including who created and distributed the video, how and why it was created and distributed, and the nature of the "Planet Hank" social media accounts. Compl. Ex. A. In a letter accompanying the CID, the AGO notified Poitras that, because the law was so new, he would not need to complete the questions—and the investigation would likely be closed—if he simply added the required disclosure to the video. Compl. ¶ 6.

The CID initially required a response within two weeks of mailing. Compl. ¶ 49. During a call with Poitras's counsel on June 23, 2026, the AGO offered Poitras an unconditional two-week extension as a courtesy, or a thirty-day extension if he agreed to comply with Act 75 by adding the statutorily required disclosure. Compl. ¶ 52. Instead, Poitras initiated this lawsuit, seeking to enjoin the AGO from enforcing Act 75 against him and to hold Attorney General Clark personally liable for alleged violations of his constitutional rights.

**ARGUMENT**

A party seeking a preliminary injunction that, as here, "will affect government action taken in the public interest pursuant to a statute or regulatory scheme," *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016), must show that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the government is the opposing party, the latter two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "These requirements are demanding, for a preliminary injunction is an extraordinary remedy never awarded as of right." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (citation modified).

Poitras faces a particularly high burden here. When a preliminary injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the movant is held to an even higher standard and must show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm. *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (citation modified). And "where the party seeking the preliminary injunction attempts to enjoin application of a governmental regulation," that injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation modified).

**I.      Poitras is unlikely to succeed on the merits.**

Act 75 regulates unprotected fraud and defamation, not core political speech. The Act's targeted definitions, narrow restrictions, and safe harbors ensure that it only restricts the most damaging fraudulent and defamatory content that the speaker knows is false. And the civil

investigative demand Poitras seeks to enjoin is nothing more than the State's lawful, constitutionally unremarkable attempt to investigate a suspected violation of that statute. Because "likelihood of success on the merits is the dominant, if not the dispositive, factor" in the injunction analysis here, the Court should deny Poitras's motion. *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

### A.    Act 75 does not violate the First Amendment.

Act 75 does not police the truth of political rhetoric or argument. It regulates fabricated audiovisual "evidence" the speaker knows to be false and deploys to deceive voters, defame candidates, or influence electoral outcomes. That is fraud on the electorate, not political debate, and the First Amendment does not stand in the way of Vermont's effort to regulate it.

### 1.    *Act 75 regulates unprotected deceptive speech.*

"[T]he First Amendment does not shield fraud." *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003). Knowing falsehoods like fraud and defamation are among the handful of "historic and traditional categories of expression long familiar to the bar" that do not enjoy First Amendment protection. *United States v. Alvarez*, 567 U.S. 709, 717, 719 (2012) (citation modified). To be sure, the mere fact that a statement is false does not remove it from the First Amendment's ambit. *See id*. at 719. But knowingly false statements that cause concrete harms, *id.*, or are made with the intent to deceive, *id.* at 723, lack constitutional protection. Vermont may regulate such speech "without affronting the First Amendment." *Id.*

And so it has. Act 75's disclosure requirement applies only to content the speaker "knows is deceptive and fraudulent." Vt. Stat. Ann. tit. 17, § 2032(a). The Act further limits its scope to defamatory content that injures a candidate or fraudulent content that a speaker distributes to "unduly influence . . . an election . . . by providing materially false information to voters." *Id.* §

7

2031(1). Those are precisely the historically recognized categories of false speech that lack First Amendment protection. *See Alvarez*, 567 U.S. at 717. And unlike the victimless lies in *Alvarez*, *see id.* at 726, a political deepfake disseminated to mislead voters before an election secures a material advantage through deception in precisely the way *Alvarez* identified as historically unprotected: by extracting "valuable consideration" through calculated falsehood instead of honest persuasion, *id.* at 723.

Act 75 does not reach true speech. By its own terms, the Act regulates only "deceptive and fraudulent" content. Vt. Stat. Ann. tit. 17, § 2032(a). "Statutory interpretation proceeds on the assumption that those who draft and enact a provision generally intend its terms to mean what they mean in ordinary usage." *Mullin v. Doe*, 146 S. Ct. 2121, 2135 (2026). Both "deceptive" and "fraudulent" carry common meanings that include an element of falsity. *See Deceive*, Webster's Third New International Dictionary (1971) ("to cause to believe the false"); *Fraud*, Webster's Third New International Dictionary (1971) ("a false representation of a matter of fact by words or conduct"). Indeed, at common law, fraud requires a material misrepresentation of fact. By using those words to define the Act's disclosure requirement, the Legislature plainly intended to reach only false representations.

The Legislature's decision to include a more specific definition for "deceptive and fraudulent synthetic media" is not to the contrary. *See* Vt. Stat. Ann. tit. 17, § 2031(1). Poitras argues that by further defining "deceptive and fraudulent synthetic media" to include merely injurious speech, the Legislature did away with the falsity inherent in fraud and deception. Pl.'s Mot. 6 (ECF No. 2). That is too clever by half. For one, it disregards the "fundamental canon of statutory construction that the words of a statute must be read in their context," not in isolation. *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 320 (2014) (quoting *FDA v. Brown & Williamson*

*Tobacco Corp.*, 529 U.S. 120, 133 (2000)); *see also Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949) (noting that courts will not apply statutory definitions "in a mechanical fashion" that would create "obvious incongruities in the language" or "destroy one of the major purposes" of a statute). That Section 2031(1)(A)'s reference to injurious speech appears inside a definition for "deceptive and fraudulent" indicates that the Legislature intended to narrow the category to a subset of knowing falsehoods, not to discard the falsity requirement altogether. That reading is confirmed by the Act's safe harbors, which focus on authenticity, not whether content is unflattering. *See* § 2032(b)(3) (exempting satire and parody), § 2032(b)(1)(A) (exempting news outlets that "acknowledge[] . . . questions about the authenticity" of published content). The statute's target is fabricated or misrepresented content passed off as real, not truthful commentary or opinion that happens to embarrass a candidate.

This reading also avoids the constitutional issues that would arise if, as Poitras argues, Act 75 were to regulate truthful speech. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). A reading of Section 2031(1)(A) that reaches true statements about a candidate would implicate the settled rule that the First Amendment shields true criticism of public figures, however damaging.[2] *See Garrison v. Louisiana*, 379 U.S. 64, 73 (1964). Because a narrower construction requiring falsity is not only available but compelled by the Act's text and structure, this Court should adopt it rather than any reading that would put Act 75 on a collision course with the First Amendment.

---

[2] Even assuming for the sake of argument that Act 75 were to reach true depictions of candidates, it still would be constitutional. Vermont has an interest in providing the electorate with information about how electoral speech was produced so they can weigh its credibility for themselves. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 367 (2010) (discussing validity of campaign finance disclosure laws). Speech that is substantively accurate but synthetically generated or altered offends that interest in no less than out-and-out lies.

### 2. Act 75 is neither content based nor viewpoint based.

Act 75 is content-neutral. "The principal inquiry in determining whether a regulation is content-based or content-neutral is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys." *Clementine Co., LLC v. Adams*, 74 F.4th 77, 87 (2d Cir. 2023) (quotation omitted). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Act 75 satisfies this test. The Act focuses not on the "communicative content" of any given piece of media, *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022), but on the way it was created and the speaker's state of mind in distributing it, *see* Vt. Stat. Ann. tit. 17, § 2031. Those are the same classifications that have long applied to fraud, defamation, and other deceptive speech without triggering heightened scrutiny or running afoul of the First Amendment.

That Act 75 regulates only some deepfakes (those that injure a candidate's reputation or seek to unduly influence an election) does not trigger strict scrutiny. Even "content-based regulation is permissible so long as 'there is no realistic possibility that official suppression of ideas is afoot.'" *Davenport v. Washington Educ. Ass'n,* 551 U.S. 177, 189 (2007) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992)). The government may proscribe a subset of unprotected speech "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." *Id.* at 388; *see also Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 492 (2025). That is precisely what the Legislature did here: in seeking to protect elections from undue influence, the Legislature regulated only content that "attempts to unduly influence" elections or that injures candidates' reputations. Vt. Stat. Ann. tit.

10

17, § 2031(1). Act 75's line drawing reflects the natural bounds of the harm the Legislature set out to address, not an impermissible effort to suppress any message.

Nor is Act 75 viewpoint based, because it does not target "particular views" or the "perspective of the speaker." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). The Act applies identically to any person who distributes media about a Vermont election in the leadup to the election—Democrats and Republicans, incumbents and challengers, advocates and critics. Nor does the Act let "flattering falsehoods" fly while punishing unflattering ones. Pl.'s Mot. 20. The Act regulates *any* deepfake that "attempts to unduly influence the outcome of an election . . . by providing materially false information to voters." Vt. Stat. Ann. tit. 17, § 2031(1)(B). A fabricated video showing a candidate performing some heroic, vote-winning act she never performed would be covered by the Act just as surely as would a video falsely showing her engaging in scandal.

      3.   *The Act is narrowly tailored to Vermont's compelling interest in preventing voter confusion and undue influence.*

Vermont has a "compelling interest in protecting voters from confusion and undue influence" brought about by deepfakes and other misleading synthetic media. *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (citing *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 228-29 (1989)).

Act 75 is narrowly tailored to that interest. The Act applies only to materials that the speaker knows to be deceptive and fraudulent, Vt. Stat. Ann. tit. 17, § 2032(a), and that either cause actual injury to a candidate's reputation or are intended to deceive the public, *id.* § 2031(1)(A). The Legislature further narrowed the Act's reach by limiting it to the 90 days before an election, *id.* § 2032(a), choosing the less restrictive means of a disclosure requirement rather

11

than an outright prohibition, *see id.*, and carving out exceptions for newsworthy and satirical speech, *id.* § 2032(b).

Those limits directly address the defects courts have identified in other states' deepfake laws. California's law, enjoined in *Kohls v. Bonta*, 797 F. Supp. 3d 1177 (E.D. Cal. 2025), banned deepfakes outright and covered any depiction "reasonably likely to harm" a candidate, a standard the court found constitutionally overinclusive. *Id.* at 1183, 1186 (citing Cal. Elec. Code § 20012(b)(1)(A)). Act 75 does neither: it imposes a disclosure requirement, not a prior restraint, Vt. Stat. Ann. tit. 17, § 2032(a), and its provision addressing defamatory deepfakes requires a showing of actual injury, *id.* § 2031(1)(A). Hawai'i's law, enjoined in *Babylon Bee, LLC v. Lopez*, 818 F. Supp. 3d 1181 (D. Haw. 2026), swept in satire and threatened violators with jail time. *Id.* at 1207; Haw. Rev. Stat. Ann. § 11-303(d)-(f). Act 75 expressly shields satire, Vt. Stat. Ann. tit. 17, § 2032(b)(3), and violators of the Act face only fines, *id.* § 2033(a).

Courts have consistently upheld value-neutral and purely factual disclosure requirements in the election context. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366-67 (2010) (citing *Buckley v. Valeo*, 424 U.S. 1, 66-68 (1976)). Like a requirement that political advertisements identify who paid for them, Act 75's disclosure requirement "identif[ies] the source" of deceptive synthetic media "so that the people will be able to evaluate the arguments to which they are being subjected." *Id.* at 368 (quoting *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 792 n.32 (1978)). That purely factual clarification stands in stark contrast to the ideologically laden messages that courts have invalidated under the compelled speech doctrine. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 713 (1977) (state could not require citizens to include state motto on license plate); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (state could not require newspapers to afford political candidates a right of reply in

editorial pages). Act 75 does not commandeer a speaker's platform or prescribe any sort of ideological orthodoxy; it simply requires speakers to explain their work.

Poitras argues that Vermont should have relied on counter speech to mitigate the confusion and deception wrought by political deepfakes. Pl.'s Mot. 15-16. While some courts have found counter speech to be an effective alternative to more stringent regulations in certain instances, no court has ever characterized counter speech as "the Constitution's chosen remedy." Pl.'s Mot. 15. And counter speech is not "at least as effective in achieving [Act 75's] legitimate purpose" as is the Act's disclosure requirement. *Reno v. ACLU*, 521 U.S. 844, 874 (1997). "False statements of fact," such as deepfakes, "interfere with the truth-seeking function of the marketplace of ideas," so they "cannot easily be repaired by counter speech, however persuasive or effective." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 52 (1988). A straightforward disclosure statement provides clarity to viewers about what is true or untrue; in today's fragmented and increasingly online media market, counter speech may only muddy the waters.

In any event, Act 75's disclosure requirement serves the same constitutional function as counter speech. Disclosure, like counter speech, leaves the speaker's statement in circulation while adding information a listener needs to evaluate its truth value. Both therefore comport with the longstanding principle that "the remedy to be applied [to falsehoods and fallacies] is more speech." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). Act 75 simply ensures that the public has access to that clarifying information at the same time as the original statement, instead of leaving to chance whether a counter-speaker will ever reach the same audience.

Poitras also argues that the very fact of the CID betrays the hollowness of the Act's safe harbor for satire. Pl.'s Mot. 19. But no statutory safe harbor is self-executing by a party's own

13

say-so; a claimed exemption must always be tested against the facts, and testing it is precisely what an investigation does. *Cf. Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 94 (2d Cir. 2016) (noting that a party invoking a statutory safe harbor bears the burden of proving that it applies). The CID does not reflect any predetermined view that the video violated Act 75. Rather, the CID notes "a reasonable basis to believe" that the video was unlawful, Compl. Ex. A at 3, and asked Poitras to "describe the type of content" that is posted to the Planet Hank social media accounts to determine whether Planet Hank is in fact a satirist, Compl. Ex. A at 8. That is because the Act's satire safe harbor turns on the *speaker*'s status as a satirist, not on a subjective, post-hoc determination of whether a particular speech act is satirical. *See* Vt. Stat. Ann. tit. 17, § 2032(b)(3) (providing that the Act shall not apply to "a person" who produces or distributes satire or parody). The Onion may publish deepfakes without disclosure; the New York Times may not.

Poitras's illustrative examples further confirm that his arguments rest on an implausible reading of the Act. As an example of a laudatory image Act 75 would permit, Poitras offers a mashup of Rep. Balint's face on George Washington's body in *Washington Crossing the Delaware*; as an example of a critical depiction the Act would ostensibly punish, he offers an image of Rep. Balint accepting a briefcase of ill-begotten cash while levitating over a crowd of Lilliputians in old-timey garb. Pl.'s Mot. 13-15. Of course, the Act would not reach either image because neither "appears to a reasonable person to be a realistic representation" of Rep. Balint. Vt. Stat. Ann. tit. 17, § 2031(1)(A).

4.  *The Act is neither overbroad nor vague.*

The overbreadth doctrine is "strong medicine" employed "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). For a statute to be invalid under the overbreadth doctrine, it must punish a "substantial amount of protected free speech" relative to

14

its "plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 120 (2003) (quoting *Broadrick*, 413 U.S. at 615) (internal quotation marks omitted). Poitras does not appear to dispute that Act 75 has a plainly legitimate sweep. *See generally* Pl.'s Mot. 17-18.

Instead, he proposes a parade of images that the Act allegedly proscribes. *See id.* But those examples merely betray Poitras's poor grasp of how Act 75 works, because the Act would not reach any of them. Documentaries using a candidate's own words, archival footage of real events, reenactments of documented conduct, retouched but genuine video, and true unflattering clips are all, tautologically, true. Pl.'s Mot. 17-18. Act 75 reaches only "deceptive and fraudulent"—that is, false—speech. Vt. Stat. Ann. tit. 17, § 2031(1)(A). Nor would the Act reach a citizen who inadvertently reposts a deceptive deepfake, Pl.'s Mot. 18, because it applies only to speech that the speaker "knows is deceptive and fraudulent," Vt. Stat. Ann. tit. 17, § 2032(a). Poitras's "fanciful" hypotheticals do not establish substantial overbreadth. *United States v. Hansen*, 599 U.S. 762, 770 (2023).

Poitras's vagueness challenge fares no better. The Legislature defined the Act's contours with objective and ascertainable standards, providing ordinary readers with "fair notice" of what is "required of them" and establishing clear criteria to prevent "arbitrary or discriminatory" enforcement. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). An ordinary citizen knows when the Act applies (during the 90 days before an election), what it applies to (deepfakes that defame a candidate or provide materially false information to voters), and what it requires (disclosure that the media was digitally generated or manipulated). Vt. Stat. Ann. tit. 17, §§ 2031-32. Similarly, the Act's exemptions provide fair notice because they turn on a speaker's objective identity rather than a subjective or post-hoc assessment of his speech. *See id.* § 2032(b)(1)-(3) (exempting "bona fide" news broadcasts, written publications "that routinely

15

carr[y] news and commentary," and any "person that produces or distributes . . .satire or parody").

The statute's scienter requirement further "mitigate[s]" any vagueness concerns, "especially with respect to the adequacy of notice" to Poitras "that his conduct is proscribed." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). *See also Holder v. Humanitarian Law Project*, 561 U.S. 1, 20-21 (2010) (noting that a "knowledge requirement . . . reduces any potential for vagueness"). The Act applies only to a speaker who distributes content that he "knows" is deceptive. Vt. Stat. Ann. tit. 17, § 2032(a). A speaker who knows his own work is fraudulent has fair notice that it is covered by the Act; a satirist who knows his work is a joke has fair notice that he is not covered. That the Act requires not just knowing publication but knowledge that the published content is false further insulates it against any vagueness challenge. *Cf. United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (avoiding constitutional doubt by construing statute to require knowledge of contents).

### B. The CID is a constitutional attempt to investigate a suspected violation of a new statute.

The First Amendment does not immunize citizens from responding to relevant questions pursuant to a valid government investigative demand.[3] *See Branzburg v. Hayes*, 408 U.S. 665, 682, 691 (1972). Compulsory process claims are analyzed under exacting scrutiny, which requires a "substantial relation" between the investigative demand and a "sufficiently important governmental interest." *Doe v. Reed*, 561 U.S. 186, 196 (2010) (quotation omitted). "[T]he

---

[3] That the existence of a CID presents a "justiciable First Amendment injury" is irrelevant to whether Poitras is likely to succeed on the merits. Pl.'s Mot. 10 (citing *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114 (2026)). Standing is a threshold question of whether a plaintiff has pled a legally cognizable injury. And the Court in *First Choice* expressly did not "decide the merits of [the plaintiff's] federal lawsuit, only whether it may proceed." 146 S. Ct. at 1121.

strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (quotation omitted).

The CID is a routine use of a routine investigative tool, and it satisfies exacting scrutiny. "The State's interest in preserving the integrity of the electoral process is undoubtedly important," and it is "particularly strong with respect to efforts to root out fraud." *Id.* at 197. Here, Vermont seeks to determine whether a highly publicized video, *see* Compl. ¶¶ 27-28, with the potential to mislead voters violates a recently-enacted state law regulating deceptive and fraudulent media. And even if Poitras did not intend to mislead voters—a fact the CID tries to discover, Compl. Ex. A at 5— the State's interest in enforcing election integrity laws "extends to efforts" to combat infractions "caused . . . by simple mistake." *Reed,* 561 U.S. at 197-98.

The CID is narrowly tailored to Vermont's interest in rooting out fraud. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 610 (2021) (requiring narrow tailoring under exacting scrutiny). It asks only fifteen short questions that track the elements of the suspected violation and nothing more: who created the video, when it was posted, what digital tools were used, and whether it carried the statutorily required disclosure. Compl. ¶ 46. Nothing in the record suggests that the AGO seeks anything beyond what is necessary to evaluate the lawfulness of the single video at issue.

That is a far cry from the "completely unlimited" information gathering that violates the First Amendment by requiring parties to reveal "every conceivable kind of associational tie." *Shelton v. Tucker*, 364 U.S. 479, 488 (1960). *See also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958) (requiring targeted organization to divulge its entire membership list). Indeed, the Supreme Court has explicitly distinguished between such pre-investigatory "indiscriminate collection" of private information (which offends the Constitution) and "targeted

17

request[s]" that "ask[] for a wide range of information early in the investigative process" (which do not). *AFPF*, 594 U.S. at 614. The CID falls squarely in the latter category.

Nor is it surprising that three of the CID's fifteen questions focus on Rep. Balint while none of them focus on Coester. Compl. Ex. A at 7-8. By Poitras's own characterization, the video primarily provides "commentary on Ms. Balint's political views." Compl. ¶ 4. And whereas "Rep. Balint complained vociferously" about the video's representations of her, Compl. ¶ 28, Coester described the video as "hilarious," Seven Days, *An AI Video Targets Rep. Balint— and Spurs Debate About the Tech in Campaigns* (June 9, 2026), https://perma.cc/YDA5-UXJQ. The Attorney General's Office therefore had reason to believe that the video's depictions of Rep. Balint were more likely to violate the Act's prohibition on injurious deepfakes than its depictions of Coester, and the office accordingly tailored its CID to address those depictions.

The CID is not coercive. Pl.'s Mot. 11. The CID's warning that a knowing and intentional violation of the Act is subject to criminal prosecution is statutorily required boilerplate, not an individualized threat to Poitras. *See* Vt. Stat. Ann. tit. 17, § 2042(a)(3). And the AGO's statement that compliance with the disclosure requirement would likely close the investigation reflects routine investigatory procedures, not unconstitutional leverage. Compl. Ex. A at 1. Indeed, that the Attorney General's Office communicated this offer directly to Poitras (and no one else) stands in contrast to cases where the government pressured third parties to cut off a speaker's access to the market entirely without an individualized investigation into the speaker himself. *See, e.g.*, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-68 (1963). Finally, any material produced in response to the CID will remain confidential absent a court order to the contrary. *See* Vt. Stat. Ann. tit. 17,

18

§ 2042(a)(4). Statutory boilerplate, an offramp from further investigation, and a confidentiality guarantee are the hallmarks of good government procedure, not unconstitutional coercion.

**II.     Poitras has not shown that he will suffer irreparable harm in taking either course of action available to him.**

A party seeking a preliminary injunction must demonstrate that it faces "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023). Here, Poitras must further make a "strong showing of irreparable harm" because an injunction would provide him with "substantially all the relief sought" in this case. *Actavis PLC*, 787 F.3d at 650. As Poitras himself pointed out in his motion, "[p]olitical speech is speech tied to a clock." Pl.'s Mot. 22. And that clock runs out on November 3, 2026, after which Poitras will no longer need to disclose the synthetic nature of his future videos until the next Vermont election period comes around. *See* Vt. Stat. Ann. tit. 17, § 2032(a). A hearing on this motion will not take place until August 24. *See* Order (ECF No. 16). Were this court to award Poitras preliminary relief, not even the most aggressive briefing schedule could plausibly result in a final determination on the merits before this November's election. And any relief that allowed Poitras to violate Act 75 up through Election Day would be effectively final, even if preliminary in name. *See Actavis PLC*, 787 F.3d at 650-51 (preliminary injunction granting relief past critical date of patent exclusivity expiry warranted heightened standard).

Whatever standard applies, Poitras has not met it. Poitras continually asserts that he "loses the opportunity to speak" if he complies with the law. Pl.'s Mot. 22. But Act 75 does not require Poitras to silence himself, nor does it stop him from producing other false, disparaging election related content. It simply requires that he append a disclosure to any such content that he publishes. And this Court has recognized that a disclosure requirement does not constitute an

19

irreparable harm because it does not stop a speaker from "disseminating a message." *Int'l Dairy Foods Ass'n v. Amestoy*, 898 F. Supp. 246, 251 (D. Vt. 1995) (denying preliminary injunction in challenge to milk labeling law). Like the law in *International Dairy Foods*, Act 75 simply "requires [Poitras] to truthfully disclose the method used in producing [his] product." *Id*. at 251-52.

Nor does Poitras show that he faces an injury that is "real and imminent, not remote." *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992) (quotation omitted). A "conjectural chill is not sufficient to establish real and imminent irreparable harm." *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999). Poitras offers nothing that would nudge his fear of self-censorship from the conjectural to the concrete. He has not taken down his video; he has not added the required disclosure; and he has continued to publish videos that likely fall within Act 75's ambit, seemingly without hesitation. *See, e.g.*, Planet Hank, *Coming Soon... "Becca & FTX: The Visit,"* Facebook (July 19, 2026), https://perma.cc/XG2P-E3UY. Whatever "sword" Poitras believes hangs overhead has not deterred him yet. Pl.'s Mot. 22.

Instead of real or specific concerns, Poitras simply repeats the "conclusory assertion" that Act 75 and the CID will infringe on his First Amendment rights. *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 766 F.2d 715, 722 (2d Cir. 1985). He complains that answering the CID will cause him to divulge basic information about his video, yet he says nothing about why that disclosure would harm him. Pl.'s Mot. 21. In any event, Poitras's own complaint identifies him as Planet Hank and confirms that he used artificial intelligence and other digital tools to create the video. Compl. ¶ 21; *see also* Poitras Decl. ¶¶ 3-4 (admitting same under oath). The two facts he claims cannot be revealed in a confidential CID—his identity and his methods—are already public, by his own choice, in this litigation. Poitras also complains that

20

compliance with the Act forces him to "carry a government script declaring his satire false." Pl.'s Mot. 22. But satire is, by definition, untrue, and Poitras provides nothing else to demonstrate how the required statutory disclosure would harm him.

To the extent Poitras's alleged harm turns on possible financial burdens from the Act, he substantially overstates his exposure. The Act imposes a base fine of "not more than $1,000.00" for a first violation, and reserves its higher fines (up to $5,000, $10,000, or $15,000) for violations involving intent to cause violence or bodily harm or repeat violations within five years. Vt. Stat. Ann. tit. 17, § 2033(a)(1)-(3). Nothing in the record suggests that either aggravating factor is present. Poitras's actual exposure from the CID, then, is capped at $1,000, not the $5,000 figure his motion invokes. See Pl.'s Mot. 22.

III.    **The balance of equities and public interest favor the Attorney General's Office application of Act 75.**

When the defendant is the government, the balance of equities and public interest merge because the government's interest is the public interest. *Nken*, 556 U.S. at 435. In assessing these factors, a court should consider "the public consequences of employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation omitted). States have a cognizable interest in enforcing their duly enacted laws. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (addressing state's motion for stay pending appeal). Where state laws are "attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (quotation omitted). Federalism principles thus "militate heavily against the grant of an injunction" against a state executive branch "except in the most extraordinary circumstances." *Id*. at 379-80.

21

Here, the Vermont Legislature balanced the twin concerns of election integrity and free speech and adopted a law that protects both. The AGO is administering that law pursuant to its new statutory mandate. Vt. Stat. Ann. tit. 17, §§ 2041-42. In doing so, it has taken no extraordinary path of enforcement. It has invoked the ordinary investigative authority the Legislature gave it, via a CID that asks Poitras to answer a handful of brief factual questions narrowly focused on identifying whether a legal violation occurred. The Attorney General's Office has already afforded Poitras extra time to respond. *See* Compl. ¶ 49. Granting Poitras's requested preliminary injunction would undermine that ordinary process of good governance and would frustrate the Legislature's policy goals before they ever have a chance to materialize.

The equities tip further against Poitras because the Legislature gave him a path to the relief he now seeks, and he chose not to use it. "[A]ny person aggrieved by a civil investigation" under Act 75 may petition for expedited relief in state court, where such proceedings "take precedence on the docket over all other cases." Vt. Stat. Ann. tit. 17, § 2042(d). While the availability of that remedy does not divest this Court of jurisdiction over Poitras's claims, *see First Choice*, 146 S. Ct. at 1121, it does tilt strongly against this Court's grant of extraordinary equitable relief when the Legislature designed an orderly, expedited forum to resolve this exact dispute.

## IV.    Any injunction should be limited in scope.

If the Court were to grant Poitras's motion—which it should not—any injunction should be limited in scope. The Court may grant injunctive relief only to the particular plaintiffs in a case, not to third parties. *Trump v. CASA, Inc.*, 606 U.S. 831, 844 (2025). And "[i]njunctive relief should be narrowly tailored to fit specific legal violations." *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994). *Cf. Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (when crafting remedies, courts should "limit the solution to the problem").

22

So, if the Court were to conclude that some but not all of the Act or the CID infringes on Poitras's constitutional rights, it should enjoin only the problematic provisions while leaving the rest intact.

Nor should the Court issue any injunction without first requiring Poitras to post a bond "in an amount that the court considers proper to pay the costs and damages sustained by" Vermont from an erroneous injunction. Fed. R. Civ. P. 65(c). Vermont's costs from such an injunction would be immense. Poitras asks the Court to bar the Attorney General's Office from enforcing Vermont's new deepfake disclosure law during the final months before the upcoming midterm elections. As the facts of this case show, deepfake videos present a rapidly expanding threat to public discourse. Poitras argues that the State could address that threat with counter speech. *See* Pl.'s Mot. 15. If the Court were to agree, it should require Poitras to post a bond in an amount proper to cover the costs of any such counterprograming.

**CONCLUSION**

The Court should deny Plaintiff's motion for a preliminary injunction.

DATED August 6, 2026

> STATE OF VERMONT
>
> CHARITY R. CLARK
> ATTORNEY GENERAL
>
>
> By:    */s/ Samuel B. Stratton*
>          SAMUEL B. STRATTON
>          Assistant Attorney General
>          Office of the Attorney General
>          109 State Street
>          Montpelier, VT 05609
>          (802) 828-3171
>          sam.stratton@vermont.gov
>
>          *Counsel for Defendant*

23