**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

HENRY L. POITRAS,

     *Plaintiff,*

   v.

CHARITY CLARK, Attorney General of
Vermont, in her official and personal
capacities, and
LESLIE A. WELTS, Assistant Attorney General
of Vermont, in her official and personal
capacities,

     *Defendants.*

**Case No. 2:26-cv-00234-wks**

**FIRST AMENDED COMPLAINT FOR MONETARY,
INJUNCTIVE, AND DECLARATORY RELIEF**

## I.    Introduction.

1.    This is an action under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), in which Plaintiff Henry L. Poitras seeks declaratory, injunctive, and other relief arising from an unconstitutional enactment of the Vermont Legislature, Act 75, which the Defendants are charged with enforcing and are now enforcing against Plaintiff.[1]

2.    On June 7, 2026, Plaintiff, who publishes political satire and commentary under the pseudonym "Planet Hank," posted a short, pointedly comedic video titled "Mark Helps Vermont Take Out The Trash." Planet Hank, *Mark Helps Vermont Take Out The Trash*, Facebook (June 7, 2026), https://www.facebook.com/watch/?v=1741113680212136. The video lampoons Vermont

---

[1]Plaintiff brings this Complaint based on personal knowledge as to all facts relating to him directly, and on information and belief as to all other matters.

politics and depicts Becca Balint, the incumbent Democrat United States Representative for Vermont and a candidate for reelection in 2026, and Mark Coester, the Republican candidate expected to challenge Balint in the November general election. The video is core political speech, in which the incumbent congresswoman is mocked and derided, and ultimately dropped by Coester from the bucket of a large excavator into a garbage dumpster in front of the golden dome of the state capitol, one of Vermont's most recognizable landmarks and a symbol of government power. Still images from the video are recreated here:

 

3.    Audio from this video criticizes the incumbent's New Jersey ties, her position on taxation and government spending, her agricultural policies, her autocratic tendencies, and other aspects of her personality and politics.

4.    The video is realistic. However, no one, but a very young child or an unusually gullible person, would believe that the video, which also depicts Balint wearing

a French-style beret as she is being lifted into the dumpster, is real, or that it is not a satirical commentary on Balint's political views, candidacy, and elite persona.

5.      Five days after the video was posted, the Vermont Attorney General opened a formal investigation and served Plaintiff with a Civil Investigative Demand under 17 V.S.A. § 2042 (CID). ECF No. 1-1. The CID commands Plaintiff to answer fifteen sworn questions about whether he made the video, how he made it, what artificial-intelligence or digital tools he used, what prompts he entered, whether he intended the depiction to look "realistic," and who else was involved in his pointed political commentary. The demand goes further and threatens that Plaintiff's satire may itself be a crime, warning that "[a] person who knowingly and intentionally violates subchapter 4 of chapter 35 of Title 17 is subject to criminal prosecution." ECF No. 1-1 at 10.

6.      But that's not all: Vermont's Attorney General, acting through Welts, offered to withdraw her CID and shut down her investigation, with its threats of civil and criminal penalties, if only Poitras would withdraw or alter his speech: "if you bring the video into compliance with the new law by properly incorporating the required disclosure, our office will withdraw the demand and likely consider the investigation closed." ECF No. 1-1 at 1. The law is thus not only restricting Poitras's speech according to its plain terms, but the Defendants' official enforcement actions betray a policy of using threats of civil penalties and criminal prosecution to chill speech. The investigative process itself also acts as a punishment to chill the speech of Plaintiff and others.

7.      This lawsuit follows because Vermont's law is blatantly unconstitutional. See *Kohls v. Bonta*, 797 F. Supp. 3d 1177 (E.D. Cal. 2025) (permanently enjoining California's materially identical synthetic-media disclosure law as an unconstitutional

restriction on core political speech that fails strict scrutiny and impermissibly compels speech), *appeal docketed*, No. 25-6138 (9th Cir.).

8.    This lawsuit challenges an incumbent-protecting Vermont law that improperly restricts the First Amendment rights of citizens who wish to criticize politicians. Act 75 forbids the publishing, communication, or distribution of digitally-created media that "injures the reputation of a political candidate" or "unduly influence[s] the outcome of an election" unless the speaker attaches a government-scripted disclaimer that, for video, must run "for the full duration of the video recording." 17 V.S.A. §§ 2031, 2032(a). Enforcement of this unconstitutional law should be enjoined.

9.    This statute burdens core political speech and satire, and subjects the speakers to state investigations, civil penalties, and prosecutions. The law is both content-based and viewpoint-discriminatory: it burdens any digitally-created media that injures the reputation of a political candidate, whether the depiction is true or false, while permitting digital media that flatters a candidate, even when false. The reputational-injury trigger in 17 V.S.A. § 2031(1)(A) contains no falsity element and thus penalizes even true speech or opinion.

10.    The Defendants' enforcement of the law is at least as problematic as the law itself: Plaintiff finds himself faced with a Hobson's choice: he can self-censor and stifle his efforts to criticize an incumbent, or he can face costly and burdensome civil investigative demands accompanied by warnings of civil penalties and criminal prosecution.

11.    Act 75 is a near-copy of a California statute that a federal court has already declared unconstitutional and permanently enjoined. *Kohls*, 797 F. Supp. 3d at 1192 (granting summary judgment and permanently enjoining California Assembly Bill 2839).

4

Vermont enacted the very features that doomed the California law: the same reputational-harm trigger and the same full-duration, on-screen disclaimer. Vermont's law is, if anything, more sweeping than the California statute. California reached only content that is "materially deceptive," meaning false. Act 75 contains no falsity element in 17 V.S.A. § 2031(1)(A) and burdens even a truthful video so long as it "injures the reputation" of a candidate. Act 75, in the hands of Defendant, also threatens criminal punishment that the California civil statute never imposed.

12.     Based on the text of the First Amendment and binding precedent, Act 75 is unconstitutional on its face and as applied. Plaintiff is entitled to preliminary and permanent relief against this unconstitutional enactment, and to an order quashing the CID.

## II.    Jurisdiction and Venue.

13.     This Court has subject-matter jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 because they present a federal question under U.S. Const. art. III, § 2 and 28 U.S.C. § 1331.

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (a)(4).

15.     This Court has jurisdiction to restrain the unconstitutional enforcement of a state legislative act pursuant to *Ex parte Young*, 209 U.S. at 123.

16.     This Court has jurisdiction to declare the rights of the parties pursuant to 28 U.S.C. §§ 2201 and 2202, and to grant injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure.

17.    This Court has personal jurisdiction over Defendants. Clark resides and maintains her office in Vermont. Welts works in Vermont as Clark's agent and attorney, and Welts personally directed enforcement activity at Plaintiff in this District.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Plaintiff resides and posted the video at issue in this District. Defendants served the CID on Plaintiff here. Clark resides here, both Defendants maintain their offices here, and all relevant acts and omissions occurred here.

19.    Plaintiff has standing, and his claims are ripe. The Defendants' outstanding investigative demand is a present injury to Plaintiff's First Amendment rights that exists not only when the demand is enforced but for as long as it remains outstanding. *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026). A speaker who faces a credible threat of enforcement under a law that arguably reaches his protected speech need not await prosecution to challenge it. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

20.    No abstention doctrine bars this Court's review. The CID is an executive, investigative act; it is not a pending state judicial proceeding, and no state-court proceeding concerning Plaintiff is pending. *Younger* abstention is therefore inapplicable. *Younger v. Harris*, 401 U.S. 37, 43-44 (1971); *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013). Because no state proceeding is pending, declaratory and injunctive relief are available. *Steffel v. Thompson*, 415 U.S. 452, 462 (1974). Nor does the *Rooker-Feldman* doctrine deprive this Court of jurisdiction, because that doctrine bars only a suit seeking federal review and rejection of a state-court judgment, and no state court has entered any judgment against Plaintiff. *T. M. v. University of Maryland Medical System*

*Corp.*, 146 S. Ct. 1739, 1744 (2026); *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 292-293 (2005).

## III.  Parties.

21.    Plaintiff Henry L. Poitras is a United States citizen who resides in Brattleboro, Vermont. The summer after graduating from High School in Keene, New Hampshire, he enlisted in the United States Marine Corps and reported to boot camp at Parris Island in South Carolina. Mr. Poitras fought in the Iraq war and is a disabled combat veteran. He is the person who publishes satire and political commentary through the "Planet Hank" accounts on X, Facebook, and other social-media platforms. He has a critical view of incumbent Vermont politicians and has used artificial intelligence and other digital tools to lampoon and criticize such politicians. He intends to continue to do so in the future, especially in the election season.

22.    Poitras is a citizen of the United States and of the State of Vermont and is lawfully entitled to vote in federal elections.

23.    Defendant Charity R. Clark is the Attorney General of the State of Vermont and is sued in her official capacity. Pursuant to 17 V.S.A. §§ 2041 and 2042, the Attorney General is authorized to investigate and enforce Act 75, to issue and judicially enforce CIDs under the statute, and to "institute any appropriate action, injunction, or other proceeding" to enforce it. Her office issued the CID at issue in this case, designated AGO Matter No. 26-SM-101. Her official address is: Office of the Attorney General, 109 State Street, Montpelier, VT 05609. At all relevant times she has acted, and threatens to act, under color of state law.

7

24.     Plaintiff sues Clark in her official capacity for declaratory and injunctive relief. A suit against a state officer in her official capacity to enjoin the enforcement of an unconstitutional state law is authorized by *Ex parte Young*, 209 U.S. at 123, and is not barred by the Eleventh Amendment. *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989). Official-capacity relief of this kind runs against the office, and through it the State, to prevent the ongoing and future enforcement of Act 75 against Plaintiff.

25.     Plaintiff sues Clark in her personal capacity for damages caused by her own acts under color of state law. On information and belief, Clark personally directed and authorized Matter No. 26-SM-101, the CID, and the continued effort to induce Plaintiff to remove and alter his political speech. Welts carried out Clark's direction as Clark's agent and attorney. Clark's personal liability arises from her own direction and authorization, including the enforcement acts Welts carried out on Clark's behalf. A state official sued in her individual capacity for acts taken under color of state law is a "person" subject to suit for damages under 42 U.S.C. § 1983. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).

26.     Defendant Leslie A. Welts is an Assistant Attorney General of Vermont. Her official address is Office of the Attorney General, 109 State Street, Montpelier, Vermont 05609. At all relevant times, she acted under color of state law.

27.     Plaintiff sues Welts in her official capacity for declaratory and injunctive relief. Welts signed and issued the June 12, 2026 opening letter and CID, asserted that the Office had a reasonable basis to believe Plaintiff violated Act 75, and demanded sworn answers and documents. On information and belief, she remains an official responsible for the challenged enforcement.

28.     Plaintiff sues Welts in her personal capacity for damages caused by her own acts. Welts personally signed, issued, and pursued the CID. She also conveyed the offer to end or curtail the investigation if Plaintiff remove his speech and added the statutory disclaimer to the video. Adding the statutory disclaimer would have required first removing the message from social media platforms, thereby destroying its reach and momentum. These acts burdened and chilled Plaintiff's protected speech.

29.     Welts was familiar with Act 75 before this investigation. Vermont's official legislative record identified her as an Assistant Attorney General and Chief of the General Counsel and Administrative Law Division. It records her testimony before committees considering S.23 on April 9 and May 7, 2025. Vermont General Assembly, S.23 (Act 75), https://legislature.vermont.gov/bill/status/2026/S.23 (last visited Aug. 5, 2026).

30.     References to conduct by the Attorney General's Office describe official-capacity enforcement. Plaintiff's personal-capacity claims rest on the acts attributed separately to Clark and Welts in this First Amended Complaint.

## IV.   Factual Allegations.

### *Political satire of public figures, including elected officials and candidates, is core political speech fully protected by the First Amendment.*

31.     Plaintiff publishes satirical and parodic political content under the name "Planet Hank" on X, Facebook, and other social media outlets. His work comments on, mocks, and exaggerates the conduct and statements of Vermont politicians and public figures, in the long tradition of American political caricature. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 54-55 (1988) (recounting the prominent role of "graphic depictions

and satirical cartoons" in American political debate "from the early cartoon portraying George Washington as an ass down to the present day").[2]

32.     Like much political satire, Plaintiff's content frequently borrows the visual and audio vocabulary of ordinary political media, including the look of a campaign advertisement, to heighten its comedic and rhetorical effect.

33.     On June 7, 2026, Plaintiff posted to the Planet Hank accounts on X and Facebook a short video titled "Mark Helps Vermont Take Out The Trash." The video criticizes Balint's political policies and personality traits. It starts with Congresswoman Balint (impossibly) drinking from the plunger of a hypodermic syringe (a "Rig" in the vernacular of heroin addicts) that is drawing from a bejeweled, vacuum-insulated mug, and culminates in her being scooped up from a pile of fall-foliage by a piece of heavy machinery operated by Coester and dropped into a dumpster in front of the Vermont State Capitol while a narrator says "help Vermont take out the trash." The Facebook video has generated more than 30,000 views.

34.     Poitras's video struck a nerve. Balint complained vociferously about it on her Facebook account, declaring that "Vermonters deserve campaigns built on truth, not AI-generated lies. . . . This kind of deception has no place in our democracy, and it should concern everyone regardless of party." Becca Balint for Congress, Facebook (last visited July 6, 2026), https://www.facebook.com/share/r/1SNF8tj3Bf/. She even appeared on MSNBC's Morning Joe, a national and influential news show that garners more than

---

[2] If George Washington was a declared candidate, a digital depiction of him as an ass would violate Vermont's law, but a digital reenactment of General Washington leading the Continental Army across an ice-filled Delaware River in December 1776 would be permissible. These scenarios demonstrate the irreconcilable conflict between Vermont law, American tradition, and the First Amendment to the United States Constitution.

700,000 daily viewers, to complain about the video and present her own political views. She posted this interview onto her campaign Facebook page. See Becca Balint for Congress, Facebook (last visited July 6, 2026), https://www.facebook.com/share/v/18wJT3RBSy/. Her Facebook postings have garnered more than 30,000 views.

35.     Poitras's video is political commentary and satire. It concerns the incumbent United States Representative for Vermont and a candidate for reelection in the 2026 election cycle, including the primary election scheduled for August 11, 2026, and it also depicts Mark Coester. On its face, the video is obvious satire and parody, not a sincere or deceptive representation that the depicted persons actually did or said the things portrayed. Regardless, Defendant's office asserted "it has determined there is a reasonable basis to believe that [Plaintiff] violated Vermont's synthetic media disclosure laws," threatening civil and criminal penalties, and reducing the statute's satire exception to an affirmative defense, at best, to be asserted at trial (sometime after an election when it no longer matters). ECF No. 1-1 at 5, 10.

36.     At all relevant times, Coester was a candidate seeking election as Vermont's Member of the United States House of Representatives. Plaintiff's video favorably depicted and gave lawful support and advocacy to Coester's candidacy. It praised Coester, portrayed him as a force for correcting Balint's policies, and urged viewers to "Help Vermont Take Out The Trash."

### Vermont enacted Act 75, a near-copy of the California statute already enjoined in *Kohls v. Bonta*.

37.     Act 75, "An act relating to the use of synthetic media in elections" (S.23), was signed by the Governor on March 5, 2026, and took effect on passage. It is codified

at 17 V.S.A. chapter 35, subchapters 4 and 5, sections 2031 through 2033 and 2041 through 2042. No recorded vote was taken.[3]

38.     The term "deceptive and fraudulent synthetic media" is a statutory term of art and has specialized legal meaning within Act 75. That law defines it to mean synthetic media that "appears to a reasonable person to be a realistic representation of: (A) a political candidate that injures the reputation of a political candidate; or (B) an individual that attempts to unduly influence the outcome of an election ... by providing materially false information to voters." 17 V.S.A. § 2031(1). "Synthetic media" is also a statutory term of art and is defined to include any "image, an audio recording, or a video recording ... that has been created or intentionally manipulated with the use of digital technology, including artificial intelligence." *Id.* § 2031(2). This definition, which includes all media "created ... with the use of digital technology," captures nearly all media created today. The only way to escape its reach is to use actual film or another analog means of recording audio and images.

39.     The law's operative command provides that a person "shall not, within 90 days before an election in Vermont, publish, communicate, or otherwise distribute synthetic media that the person knows is *deceptive and fraudulent synthetic media* unless the person includes a disclosure," and that for video the disclosure "shall appear for the full duration of the video recording." *Id.* § 2032(a), (a)(1) (emphasis added). The required disclosure is a state-scripted sentence: "This media has been manipulated or generated by digital technology and depicts speech or conduct that did not occur." *Id.* § 2032(a).

---

[3]     Vermont General Assembly, S.23 (Act 75), https://legislature.vermont.gov/bill/status/2026/S.23 (last visited July 8, 2026).

40. The government-dictated disclosure is required for all digital media that negatively depicts a politician, and it must say that the event depicts speech or conduct that did not occur, even if that speech or conduct did occur. And not only must it "appear in a size that is easily readable," but it must also be "inclusive to the greatest extent possible of individuals with disabilities." *Id.* § 2032(a)(1). Nowhere does the law explain what that means or how to comply with its inclusivity requirement.

41. The statute imposes fines. *Id.* § 2033(a). It also authorizes a candidate to "seek injunctive or other equitable relief prohibiting the publication, communication, or other distribution" of covered media. *Id.* § 2033(b). It further authorizes the Attorney General and State's Attorneys to investigate and enforce the law, including by CID, *id.* §§ 2041, 2042.

42. California's Assembly Bill 2839, codified at California Elections Code § 20012, prohibited the knowing distribution of an election communication containing "materially deceptive content" involving a "candidate for any federal, state, or local elected office in California portrayed as doing or saying something that the candidate did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate," and required a full-duration, on-screen disclaimer for video. In *Kohls*, the United States District Court for the Eastern District of California held that AB 2839 was a content-, viewpoint-, and speaker-based restriction on core political speech that failed strict scrutiny, that its reputational-harm standard was unconstitutionally vague, and that its full-duration disclaimer impermissibly compelled speech, and the court permanently enjoined its enforcement. 797 F. Supp. 3d at 1183–92.

43. Act 75 shares AB 2839's central, fatal features. Both turn liability on whether a digital depiction harms or injures the "reputation" of a candidate (meaning that

13

digital media promoting a candidate is permitted, while digital media that injures a candidate's reputation is prohibited whether the depiction is true or false). Both compel the speaker to run a full-duration, on-screen disclaimer on video (implicating compelled speech and compelled association concerns). Vermont enacted the precise mechanisms a federal court has already condemned in California and is now seeking to enforce a law with these same flaws. If anything, Act 75 is worse. California at least required that the covered content be "materially deceptive," that is, false; Act 75's candidate-reputation trigger contains no falsity element, so it reaches even truthful criticism that California left untouched. And where California relied on private civil suits, Act 75 deputizes the State itself, authorizing the Attorney General to open investigations, to compel sworn answers by civil investigative demand, and to threaten criminal prosecution – coercive machinery that the enjoined California law never had.

44.     Clark and Balint are personal friends. In a July 11, 2024 press release, Clark stated: "I am happy to support my friend, Representative Becca Balint, in bringing Vermont common sense to our federal elections, and to all things in Congress." Press Release, Rep. Becca Balint, Rep. Becca Balint Introduces Campaign Finance Reform Legislation (July 11, 2024), https://balint.house.gov/news/documentsingle.aspx?DocumentID=337 (last visited Aug. 5, 2026).

45.     Clark's public support for Balint extends beyond the July 2024 statement. The following photograph shows Clark standing beside Balint while Balint speaks from a lectern bearing her campaign logo:



*Representative Balint (at lectern) and Attorney General
Clark (right) appearing together at a Balint campaign event.*

46.     Clark and Balint have also campaigned together on other occasions. The following photograph shows them together on the rear platform of a train during a campaign event:



*Clark and Balint campaigning together from the rear platform of a train.*

47.     On information and belief, Clark personally directed, authorized, or approved the opening and continuation of Matter No. 26-SM-101 and the issuance and pursuit of the CID. Welts's opening letter and CID are dated June 12, 2026, five days after Plaintiff posted the video and one day after WCAX reported Balint's public denunciation and the Attorney General's ongoing review into speech that was critical of her friend and political ally. The compressed sequence, including the preparation required for a two-page opening letter and a six-page CID, supports the inference that Defendants acted

promptly in response to Balint's complaints. Welts acted as Clark's agent and attorney in implementing Clark's direction.

48.     The facts concerning Clark's internal direction and authorization are within Defendants' possession. The public timing, Clark's acknowledged personal friendship with Balint, her publicly avowed support for Balint, the synthetic media matter's focus on Balint, and the acts described in this complaint provide the factual basis for a reasonable inference that Clark and Welts acted to provide political support for Balint following complaints from Balint.

49.     Based on WCAX reporting and the timeline described above, it is reasonable to infer that during the interval between Plaintiff's June 7 post and Welts's June 12 letter, Balint or persons acting for her communicated directly or indirectly with Clark, Welts, or both about Plaintiff and the video. In any event, Balint communicated her extreme displeasure at the video through her social media postings and her media appearances, resulting in Clark and Welts using their offices to intimidate, punish, and silence Poitras, and to warn off others who might otherwise post satirical, but critical videos of Balint or other political allies of Clark.

### *Act 75 is sweeping and vague, and it reaches plainly protected speech.*

50.     Act 75 reaches truthful speech. Unlike subsection (1)(B), which requires "materially false information," subsection (1)(A) contains no falsity element. A truthful but unflattering "realistic representation" of a candidate that "injures the reputation" of that candidate is covered, and the speaker is then compelled to attach a disclaimer stating that the media "depicts speech or conduct that did not occur," even where it did. 17 V.S.A. §§ 2031(1)(A), 2032(a).

51. Act 75 reaches authentic recordings. Because "synthetic media" includes any recording "created … with the use of digital technology," *id.* § 2031(2), the statute on its face captures a genuine, unaltered video shot on an ordinary digital camera (like the ones on every smart phone), so long as it "injures the reputation" of a candidate.

52. Act 75 does not define its key terms. It nowhere defines "realistic representation," or "injures the reputation." A speaker cannot know in advance whether a depiction is "realistic" enough, or "injur[ious]" enough, to trigger the law. "Realistic representation" would appear to allow enforcement against videos that are obviously fake, leaving an enforcing officer free to subjectively decide whether a "realistic" but negative depiction harmed her friend. Citizens are also left to guess at what it means to "unduly influence an election" or what might constitute "materially false information." 17 V.S.A. § 2031(1)(B). Moreover, to the extent Act 75 borrows Title 17's definition of "candidate," that definition is potentially boundless: it reaches any individual who has taken "any affirmative action to become a candidate for public office," including merely "publicly announcing that he or she seeks such a position," 17 V.S.A. § 2103(7), sweeping in many hundreds of Vermonters at any given time and supplying no limiting principle.

53. Section 2031(1)(B)'s prohibitions are incoherent. Section 2031(1)(B) reaches digital media that "appears to a reasonable person to be a realistic representation of … an individual that attempts to unduly influence the outcome of an election, including a public question, by providing materially false information to voters." 17 V.S.A. § 2031(1)(B). That formulation is so confusing as to be nonsensical: in addition to its terms not being defined, it cannot be determined whether the "materially false information" must be supplied by the depicted individual or by the media, or how a "realistic

representation" of a person can itself "attempt[] to unduly influence" an election. Section 2031(1)(B) supplies no ascertainable standard or notice of what it prohibits.

54.     Act 75 reaches mere disseminators. Because it forbids any person to "publish, communicate, or otherwise distribute" covered media, *id.* § 2032(a), it reaches not only creators but also those who repost or otherwise share the prohibited material. Over 200 people have shared the video. These Americans and are now subject to fines of up $1,000 under the law. *Id.* at § 2033(a)

55.     Act 75 burdens the press. Its news exemption applies only if the broadcaster "clearly acknowledges through content or a disclosure … that there are questions about the authenticity" of the media. *Id.* § 2032(b)(1)(A). A broadcaster reporting on a synthetic-media controversy, such as this case, must therefore recite the State's authenticity script as the price of the exemption. This turns newscasts into veritable hostage videos, as reporters must read the state's script before reporting on political commentary or face enforcement actions, including criminal prosecution.

56.     Act 75 threatens criminal prosecution it does not define, and it contradicts itself on what it even covers. Section 2033 specifies only a "fine," with no defined crime, no term of imprisonment, and no statement whether the fine is civil or criminal. Yet section 2042(a)(3) commands that civil investigative demands warn of "criminal prosecution" for a violation of "this chapter." This despite the fact that the penalty provision punishes violations of "this subchapter," and the Defendant's own demand warns about criminal prosecution under "subchapter 4 of chapter 35 of Title 17." Vermonters like Mr. Poitras thus face threats of criminal prosecution with absolutely no notice of what conduct is ostensibly criminalized.

***The Attorney General is using Act 75 to investigate Plaintiff's satirical video and prevent political commentary that is critical of a friend, political ally, and incumbent politician.***

57. On June 12, 2026, the Office of the Attorney General sent Plaintiff an opening letter stating that it was investigating "potential noncompliance with the new synthetic media disclosure law, 17 V.S.A. § 2032," based on the June 7, 2026 video depicting Representative Balint, and assigning the matter the identifier 26-SM-101.

58. Together with that letter, the Defendant's Office served a "Civil Investigative Notice and Demand Pursuant to 17 V.S.A. § 2042," asserting "a reasonable basis to believe" Plaintiff "violated Vermont's synthetic media disclosure laws," and commanding sworn written responses and document production.

59. Welts personally signed and issued the opening letter and CID. She did so as Clark's agent and attorney and, on information and belief, at Clark's direction or with Clark's authorization. On information and belief, Clark personally authorized the investigation's object and continuation. Welts personally selected, approved, or transmitted the demands and pursued compliance. The CID involves the first enforcement action involving Vermont's synthetic media law. In order to open and carry out this enforcement action the Attorney General adopted a policy (whether formal or informal) governing Act 75 investigations and prosecutions, including but not limited to setting legal and factual predicates for opening investigations, the interpretation of terms within the statute, and how and whether to recognize the law's disclosure exceptions. That the Attorney General chose Poitras as the first person to be subjected to an Act 75 investigation gives rise to a reasonable inference that he is being prosecuted as part of an

official policy on the part of the Attorney General or that the Attorney General was the final decision maker in instituting this first-of-its-kind investigation.

60. The Defendant's CID's fifteen questions seek to compel Plaintiff to admit each element of the supposed offense, including authorship, the act and date of distribution within the statute's 90-day window, the use of artificial-intelligence or "other digital tools," the prompts and inputs used to create the video, the intent that the depiction "appear realistic," and the absence of the statutory disclosure. Other questions seek to unmask the person or persons behind the Planet Hank account and to identify other "authorized users" and participants.

61. None of the CID's fifteen questions asks whether Plaintiff intended to deceive or mislead any viewer, whether Plaintiff intended the video as satire or parody, how a reasonable viewer would understand the video, whether the depicted events were physically possible, or whether any viewer believed them to be genuine. Question 9 asks only whether the representation of Balint was intended to appear realistic; but visual realism does not establish deceptive intent. Question 13 asks for a general description of content posted to the Planet Hank accounts. It does not ask about the satirical purpose, context, or anticipated audience understanding of this video. Nor did the CID inquire into how the video's comedic and rhetorical context would be understood. The questions instead seek Plaintiff's identity, authorship, tools, prompts, distribution, collaborators, intended appearance, and omission of the State's disclosure. The CID was not aimed at discovering whether the video was satire or parody. Instead, the CID sought extensive admissions from Mr. Poitras in terms of how he created the video and with whom he was associated, and to trigger and ensure the greatly increased repeat penalties of up to $10,000.

62.     Defendants framed the CID to unmask and burden Plaintiff, expose his associates and creative process, secure admissions supporting enforcement and higher fines for subsequent offenses, and to chill further political criticism. Its questions were chosen to advance those ends. They were plainly not chosen to determine whether the video fell within Act 75's express exemption for satire and parody, as evidenced by the nature of the questions themselves.

63.     Although the Defendant's own letter states that the video depicts both Balint and Coester, not one of the demand's fifteen questions concerns Coester. ECF No. 1-1. Every question is trained on the depiction of Balint, a sitting Member of Congress and candidate (and political ally and friend of the Attorney General), confirming that the investigation's object is to protect a favored candidate from unflattering political speech. *Id*. After all, who is to say that Coester was not negatively depicted in a video that showed him hop into an excavator and violently scoop up and discard a beret-clad woman half his size?

64.     Act 75 purports to exempt satire and parody. Its disclosure requirement "shall not apply to … a person that produces or distributes deceptive and fraudulent synthetic media constituting satire or parody." 17 V.S.A. § 2032(b)(3). The video is clearly satire, but that exemption has afforded Plaintiff no protection. The Attorney General "has determined there is a reasonable basis to believe" that Plaintiff "violated" the law, and her demand seeks sworn answers "relating to the alleged violations." Because the Attorney General decides what constitutes a "violation," and has already treated Plaintiff's satire as a probable one, the statutory exemption neither prevented the investigation nor spared Plaintiff the burden, expense, and chilling effect of a sworn demand backed by the threat of civil penalties and criminal prosecution. Instead, the exemption appears to operate as

an affirmative defense, meaning the full and punishing weight of the investigatory process provided by statute and an enforcement action can be brought to bear (or threatened) on critics of favored politicians. In opposing preliminary relief, Clark now contends that the exception turns on the speaker's status as a satirist, rather than whether the particular work is satire. ECF No. 22 at 14. Her example is explicit: "The Onion may publish deepfakes without disclosure; the New York Times may not." *Id.* That position makes liability depend on the government's classification of the speaker, although the statute exempts media "constituting satire or parody." Clark supplies no objective standard by which an occasional satirist or ordinary citizen can know *ex ante* whether the exemption protects identical speech. Nor does Clark explain how speaker- and content-based speech restrictions would comport with the First Amendment in any event.

65. The Attorney General has targeted Poitras for satirical speech in bad faith. Although Clark denies in her Answer that the video is "obvious satire and parody" and denies that it is "clearly satire," ECF No. 18 ¶¶ 29, 48, those denials beggar belief.

66. Clark and Welts could not possibly have understood the video to depict literal events, as their own actions indicate. Had either Clark or Welts believed that the video depicted actual events, rather than satire, they would have contacted Balint to determine whether she was safe or to ask how she was recovering. They would also have contacted law enforcement to report that a sitting member of Congress had been scooped up by an excavator and violently thrown into a dumpster in front of the State Capitol, and drawn up an indictment charging Coester with at least five state law felonies. Neither did so, because neither Clark nor Welts believed the depicted events were real. These facts and the actual absurdity of the video support the inference that the investigation's true

purpose was to chill Plaintiff's political speech, identify the persons involved in creating it, and pressure Plaintiff to take it down and alter it.

67. Clark now asserts that the "investigation" sought to determine whether Plaintiff's conduct fell within Act 75's satire exception. ECF No. 18 at 14 (Eighth Affirmative Defense). But the CID's text and Defendants' conduct point in the opposite direction. Defendants did not ask whether Plaintiff intended to deceive or mislead any viewer, whether he intended this video as satire or parody, or how a reasonable viewer would understand it in context. Question 9 addresses only intended visual realism. Question 13 requests only a general description of the content posted to Planet Hank's accounts. Neither asks about this video's satirical purpose or anticipated audience understanding. Instead, Defendants sought to force Poitras to disclose the identities of his fellow speakers, as well as the tools and prompts used to create his art.

68. The Defendants' demand letter warned that "[a] person who knowingly and intentionally violates subchapter 4 of chapter 35 of Title 17 is subject to criminal prosecution," even though the statute provides only a fine for violation of the disclosure requirement. ECF No. 1-1 at 10. By stipulation dated July 9, 2026, Clark agreed in her official capacity to suspend the CID and any enforcement action against Plaintiff until the Court decides Plaintiff's preliminary-injunction motion. ECF No. 9 ¶ 2. The CID remains pending, and Defendants have not withdrawn it.

69. Plaintiff intends to continue posting satirical political content, including content depicting candidates and elected officials, in a way that the Defendants have treated as triggering the disclosure requirements of Act 75. The statute, the investigation, and the threat of fines and criminal prosecution chill him from doing so. Plaintiff's present decision to continue speaking despite the investigation does not eliminate that chill. For

24

each future work that may fall within Act 75, he must choose among carrying the State's script for the work's full duration (with the uncertainty of whether he has properly complied with its inclusivity requirements), delaying or withholding protected speech during an election, or risking renewed investigation and escalating penalties. Plaintiff has no adequate remedy at law. The loss of First Amendment freedoms, even for minimal periods, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

70.     Plaintiff has already suffered concrete and redressable injury. The Defendant's CID has forced Plaintiff to bear the costs of complying with an unconstitutional edict, including the time and expense of retaining counsel and preparing a response to the demand. The pending demand also reaches the identities of authorized users and collaborators, the prompts and inputs used to create the video, and other materials revealing Plaintiff's creative and associational process. It continues to burden those interests while enforcement is temporarily suspended. The Defendant's investigation and threats of prosecution have also chilled, and continue to chill, Plaintiff's protected political speech. These completed injuries entitle Plaintiff to compensatory damages and, at a minimum, to nominal damages for the violation of his constitutional rights. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 283 (2021) (holding that a plaintiff's request for nominal damages, standing alone, satisfies Article III and vindicates a completed violation of constitutional rights); *Carey v. Piphus*, 435 U.S. 247 (1978) (holding that the deprivation of a constitutional right is actionable and supports an award of nominal damages even without proof of actual injury).

71.     Plaintiff is also entitled to prospective injunctive relief because the Defendants' conduct is ongoing and because there is a real and immediate threat that the

challenged conduct will recur. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Plaintiff is a frequent political commentator who intends to continue creating and posting videos that criticize candidates and elected officials and that a reasonable reading of Act 75 would reach. Clark is an active and partisan elected official who, along with Welts, are expected to continue enforcing Act 75 and who have already shown their willingness to do so by opening this investigation and serving the CID on Plaintiff. Indeed, although Plaintiff sought a 30-day extension of time to respond to the CID, Defendants would only allow a 14-day extension unless he agreed to take down the video and affix the disclosure warning because of the potential influence of his video on the primary election in August. Absent an injunction, Plaintiff faces a credible and continuing threat of enforcement that will keep chilling his protected speech. *Susan B. Anthony List*, 573 U.S. at 159. That prospective relief is available against the Defendants in their official capacity under *Ex parte Young*, 209 U.S. at 123, and 42 U.S.C. § 1983.

## V.    Legal Arguments.

***Act 75 restricts core political speech and is presumptively unconstitutional; the State bears the burden of justifying it under the most demanding scrutiny.***

72.    The First Amendment, applicable to the States through the Fourteenth, provides that government "shall make no law ... abridging the freedom of speech." Speech concerning candidates and elections lies at the core of the First Amendment, and satire and parody of public figures are fully protected, even when caustic, exaggerated, or false. *Hustler*, 485 U.S. at 54-55; *United States v. Alvarez*, 567 U.S. 709, 722 (2012).

73.    A law that cannot be applied without examining the content of speech is content-based and is subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155

(2015). Act 75 is content-based, because coverage turns on whether speech is a "realistic representation" of a "political candidate" that "injures the reputation" of that candidate, and it is viewpoint-based, because it burdens reputation-injuring depictions while leaving flattering ones untouched.

74.    Act 75 cannot survive strict scrutiny. It is not narrowly tailored to a compelling interest, it is not the least restrictive means of addressing deceptive election media, and it reaches even truthful speech. Even as to false speech the statute is invalid, because the remedy for false or misleading speech is more speech, not enforced silence, and the government has no legitimate interest in appointing itself the arbiter of political truth and suppressing speech on that basis. *Alvarez*, 567 U.S. at 723 ("Our constitutional tradition stands against the idea that we need [a] Ministry of Truth."); *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("the remedy to be applied is more speech, not enforced silence."). This is core political speech, not commercial speech, and commercial speech is the only setting in which government may compel the disclosure of purely factual, noncontroversial information. *National Institute of Family and Life Advocates v. Becerra (NIFLA),* 585 U.S. 755, 768 (2018). A federal court has already held a materially identical statute unconstitutional on these grounds. *Kohls*, 797 F. Supp. 3d at 1183–89.

75.    The First Amendment also protects the right to refrain from speaking and forbids the government from compelling a speaker to carry its message. Act 75's full-duration, state-scripted disclaimer compels speech and defaces the speaker's own expression. And because 17 V.S.A. § 2031(1)(A) contains no falsity element, Act 75 forces the speaker of a truthful video to append to it the State's scripted declaration that the depicted "speech or conduct … did not occur," even when it did, thereby compelling the

speaker to broadcast a falsehood. This is core political speech, not commercial speech, so the deferential standard of *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), does not apply. *NIFLA*, 585 U.S. at 766–68 (subjecting content-based compelled disclosures of controversial, non-commercial speech to heightened First Amendment scrutiny); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) (striking down a compelled right-of-reply statute as an impermissible intrusion on editorial judgment); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (holding that the State may not compel an individual to carry the State's ideological message).

76. A law that burdens speech, and a law that carries penal consequences, must provide fair notice and must not invite arbitrary or discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *Connally v. General Construction Co.*, 269 U.S. 385 (1926); *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-254 (2012). Act 75's central terms, and its undefined threat of "criminal prosecution," supply no ascertainable standard.

77. A law is facially invalid if it prohibits a substantial amount of protected speech relative to its legitimate sweep. *United States v. Stevens*, 559 U.S. 460, 473 (2010); *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Act 75 sweeps in truthful depictions, authentic recordings, satire, and commentary by speakers who decline to recite the State's script, mere reposting, and the reporting of the press.

78. Injunctions forbidding future speech are the most serious and least tolerable infringement on First Amendment rights and bear a heavy presumption against their validity. *Near v. Minnesota*, 283 U.S. 697, 713 (1931); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Organization for a Better Austin v. Keefe*, 402 U.S. 415,

418–19 (1971). Act 75 authorizes candidates to obtain injunctions silencing speech about the very elections in which they are running. 17 V.S.A. § 2033(b).

79.     The First Amendment protects the right to speak anonymously about political matters and to be free from compelled disclosure that burdens protected expression and association; such compelled disclosure is subject to exacting scrutiny. *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 345-346 (1995); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461 (1958); *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 608 (2021). The Defendant's demand compels disclosure of a pseudonymous political speaker, his associates, and the creative process behind protected expression, and it inflicts a present, continuing injury. *First Choice*, 146 S. Ct. at 1125.

## VI.    Causes of Action.

80.     Plaintiff is entitled to relief under each count against both Defendants. His personal-capacity claims rest on the conduct attributed to each Defendant individually.

81.     Plaintiff raises both facial and as-applied challenges with respect to every constitutional claim set forth herein.

## Count One: Violation of the First Amendment (content-and viewpoint-based restriction on political speech).

82.     Plaintiff realleges and incorporates by reference every preceding paragraph as if fully set forth herein.

83.     To prevail on this claim, Plaintiff must establish that the Defendants, acting under color of state law, have abridged his freedom of speech through a content-based or

29

viewpoint-based regulation, and that the regulation cannot survive strict scrutiny, under which the government bears the burden of proving that the law is narrowly tailored to serve a compelling state interest and is the least restrictive means of achieving it. *Reed*, 576 U.S. at 163.

84.    Plaintiff satisfies each element. The Defendants act under color of state law in enforcing Act 75. Act 75 is content based because whether media is covered turns on whether it is a "realistic representation" of a "political candidate" that "injures the reputation" of that candidate, 17 V.S.A. § 2031(1)(A), and it is viewpoint based because it burdens reputation-injuring depictions while permitting flattering ones. The Defendants cannot carry their burden under strict scrutiny, because Act 75 is not narrowly tailored, is not the least restrictive means of addressing deceptive election media, and reaches even truthful speech, and a federal court has already held a materially identical statute unconstitutional on this ground. *Kohls*, 797 F. Supp. 3d at 1183–87.

85.    Act 75 is a content- and viewpoint-based restriction on core political speech and is subject to strict scrutiny, which it cannot survive. It is not narrowly tailored to any compelling governmental interest, it is not the least restrictive means available, and it reaches truthful protected speech. A materially identical statute failed strict scrutiny in *Kohls*. 797 F. Supp. 3d at 1183–87 (striking down a materially identical synthetic-media law under strict scrutiny as a content-, viewpoint-, and speaker-based restriction). Vermont's Act 75 reaches even further than California's unconstitutional law. Vermont's version does not require a falsity element, and punishes true but unflattering speech along with ostensibly "materially false" speech that "unduly" influences an election. Act 75 burdens truthful political speech, and it adds criminal penalties that the California civil statute never imposed, all while replicating the same viewpoint discrimination the

30

California court condemned by punishing only synthetic media that "injures the reputation" of a candidate. Clark's newly announced enforcement position adds a speaker-based distinction: identical media may be exempt when published by a speaker the State recognizes as a satirist and burdened when published by someone the State declines to classify as one. Act 75 therefore violates the First Amendment, facially and as applied to the Plaintiff (a satirist whose license to create satire is apparently unrecognized by the State of Vermont or by Defendants).

## Count Two: Violation of the First Amendment (compelled speech).

86.    Plaintiff realleges and incorporates by reference every preceding paragraph as if fully set forth herein.

87.    To prevail on this claim, Plaintiff must establish that the Defendants, under color of state law, compel him to carry a government-mandated message, and that the compulsion cannot survive the applicable First Amendment scrutiny; content-based compelled speech is subject to strict scrutiny, and the deferential review of *Zauderer* is confined to disclosures of purely factual, noncontroversial information in commercial speech. *NIFLA*, 585 U.S. at 768.

88.    Plaintiff satisfies each element. Act 75 compels him to place on his own video a state-scripted disclaimer that must run for its full duration, 17 V.S.A. § 2032(a), (a)(1); the compelled message concerns core political speech, not commercial speech, so *Zauderer* does not apply; and because Section 2031(1)(A) requires no falsity, the statute forces him to declare that his depiction "did not occur" even when it did. The requirement cannot survive strict scrutiny, and a materially identical disclaimer was held to be unconstitutional compelled speech in *Kohls*, 797 F. Supp. 3d at 1189.

89.     By requiring a speaker to attach a state-scripted disclaimer that must run "for the full duration of the video recording," 17 V.S.A. § 2032(a), (a)(1), Act 75 compels speech, defaces the speaker's own expression, and, in the case of satire, spoils the very effect that gives the speech meaning. As the court explained in striking down California's identical disclaimer requirement, "a mandatory disclaimer for parody or satire would kill the joke." *Kohls*, 797 F. Supp. 3d at 1189. The compelled-disclosure requirement is not entitled to deferential review and cannot survive the applicable scrutiny. A materially identical disclaimer requirement was held to be unconstitutional compelled speech in California. *Id*. Act 75 therefore violates the First Amendment, facially and as applied to Plaintiff. The First Amendment forbids the government from appointing itself the arbiter of political truth. *See Alvarez*, 567 U.S. at 723 (plurality op.).

## Count Three: Violation of the First Amendment (overbreadth).

90.     Plaintiff realleges and incorporates by reference every preceding paragraph as if fully set forth herein.

91.     To prevail on a facial overbreadth challenge, Plaintiff must establish that Act 75 prohibits a substantial amount of constitutionally protected speech judged in relation to its plainly legitimate sweep; a litigant may raise such a challenge even as to speech that could permissibly be regulated, because of the danger that the statute's very existence chills protected expression. *Stevens*, 559 U.S. at 473; *Broadrick*, 413 U.S. at 613.

92.     Plaintiff satisfies this standard. Act 75 sweeps in truthful depictions of candidates, authentic recordings made with ordinary digital technology, satire and parody by speakers who decline to recite the State's script, the mere reposting or sharing of covered items, and the reporting of broadcasters and the press, while its legitimate

32

sweep, if any, is comparatively slight. The statute is therefore substantially overbroad and facially invalid.

93.     Act 75 prohibits a substantial amount of protected speech relative to any legitimate sweep, including truthful depictions of candidates, authentic recordings made with ordinary digital technology, satire and parody by speakers who decline to recite the State's script, mere reposting and sharing, and the reporting of broadcasters and the press. Act 75 is substantially overbroad and facially invalid.

## Count Four: Violation of the First Amendment (prior restraint).

94.     Plaintiff realleges and incorporates by reference every preceding paragraph as if fully set forth herein.

95.     To prevail on this claim, Plaintiff must establish that Act 75 authorizes a restraint on speech in advance of its expression; any such prior restraint bears a heavy presumption against its constitutional validity, which the government bears the burden of overcoming. *Near*, 283 U.S. at 713; *Nebraska Press Ass'n*, 427 U.S. at 592; *Keefe*, 402 U.S. at 419.

96.     Plaintiff satisfies this standard. Section 2033(b) authorizes a candidate to obtain "injunctive or other equitable relief prohibiting the publication, communication, or other distribution" of covered media, 17 V.S.A. § 2033(b), placing in the hands of a self-interested candidate the power to enjoin speech about the very election in which she is running, and the Defendant's use of a CID to induce Plaintiff to withdraw and alter his speech operates as a further restraint. The Defendants cannot overcome the heavy presumption against such prior restraints.

33

97.    Act 75 authorizes a candidate to "seek injunctive or other equitable relief prohibiting the publication, communication, or other distribution" of covered media, 17 V.S.A. § 2033(b), placing in the hands of self-interested candidates a tool to enjoin and suppress speech about the very elections in which they are running. That provision, and the enforcement scheme authorizing injunctions against protected political speech, effects an unconstitutional prior restraint.

98.    Insofar as the Defendants are using a CID and threats of criminal prosecution to chill Plaintiff's speech presently and during the upcoming election, while offering to withdraw that demand if Plaintiff self-censors, the Attorney General has created a de facto prior restraint by seeking to chill and chilling Plaintiff's speech, while making clear that he can only speak on similar topics in the future if he is either willing to parrot a state-approved disclaimer or willing to risk prosecution under the threat of significantly increased penalties for repeat offenses.

## Count Five: Violation of the Fourteenth Amendment (void for vagueness).

99.    Plaintiff realleges and incorporates by reference every preceding paragraph as if fully set forth herein.

100.    To prevail on this claim, Plaintiff must establish that Act 75 fails to give a person of ordinary intelligence fair notice of what conduct is prohibited, or that it authorizes or invites arbitrary and discriminatory enforcement; the requirement of precision is heightened where a law burdens speech and where it carries penal consequences. *Grayned*, 408 U.S. at 108–09; *Kolender*, 461 U.S. at 357-58; *Fox Television Stations*, 567 U.S. at 253; *NAACP v. Button*, 371 U.S. 415, 433 (1963).

34

101.    Plaintiff satisfies this standard. Act 75's operative terms "realistic representation," and "injures the reputation" are undefined. The definition in Section 2031(2) potentially subjects all forms of modern media to the law's disclosure requirements because it defines "synthetic media" as "an image, an audio recording, or a video recording of an individual's appearance, speech or conduct that has been created … with the use of digital technology." The statute threatens "criminal prosecution" while defining no crime and conflicting internally between "chapter" and "subchapter." *Compare* 17 V.S.A. § 2042(a)(3) (requiring that the civil-investigation notice state that "a knowing and intentional violation of this chapter is subject to criminal prosecution"), *with id.* § 2033(a) (providing that a person who "knowingly and intentionally violates a provision of this subchapter shall be fined not more than $1,000.00"). The law also fails to define what it means to "unduly influence the outcome of an election" or what might constitute "materially false information." 17 V.S.A. § 2031(1)(B). Additionally, the law's disclosure statement is required to not only "appear in a size that is easily readable," but it must also be "inclusive to the greatest extent possible of individuals with disabilities." *Id.* § 2032(a)(1). No where does the law explain what that means or how to comply with its inclusivity requirement. Clark's newly announced speaker-status construction compounds these defects. It gives no notice of who qualifies as a "satirist" and invites officials to treat identical speech differently depending on the government's classification of the speaker. These defects deny fair notice and confer standardless enforcement discretion, which the Defendants have already exercised against protected satire.

102.    Act 75 is void for vagueness under the Due Process Clause of the Fourteenth Amendment, and its vagueness independently chills protected speech in violation of the First Amendment.

## Count Six: Violation of the First Amendment (compelled disclosure and unconstitutional investigative demand).

103.    Plaintiff realleges and incorporates by reference every preceding paragraph as if fully set forth herein.

104.    To prevail on this claim, Plaintiff must establish that Defendants' compelled disclosure burdens his First Amendment rights to speak anonymously and to associate, and that the demand cannot satisfy exacting scrutiny, which requires a substantial relation between the disclosure and a sufficiently important governmental interest and a demand narrowly tailored to that interest; an outstanding demand inflicts a present, cognizable injury. *Americans for Prosperity Foundation*, 594 U.S. at 609-10; *First Choice*, 146 S. Ct. at 1125.

105.    Plaintiff satisfies this standard. The CID compels him to unmask a pseudonymous political speaker and his associates, reveal the creative process behind protected expression, and admit the elements of an alleged offense. It inflicts a present injury while it remains pending. Clark personally directed and authorized the investigation and CID, on information and belief. Welts personally signed, issued, and pursued the demand. Defendants cannot show that this sweeping demand is substantially related and narrowly tailored to a sufficiently important governmental interest. It fails exacting scrutiny and the strict scrutiny applicable to its burden on core political speech.

106.    Plaintiff is entitled to a declaration that the demand is unconstitutional and to an order quashing or enjoining it.

## Count Seven: First Amendment retaliation (against Clark and Welts in their personal capacities).

107. Plaintiff realleges and incorporates by reference every preceding paragraph as if fully set forth herein.

108. Plaintiff's video and his continued criticism of Balint are protected political speech, satire, and parody. The First Amendment protects that speech at its core.

109. Defendants subjected Plaintiff to adverse action by opening Matter No. 26-SM-101 on or about June 12, 2026, five days after he posted the video, and mailing Plaintiff an opening letter and CID dated June 12. ECF No. 18 ¶¶ 5, 45. The CID was backed by threats of civil and criminal punishment. The CID was also being used to trigger significantly increased penalties for subsequent violations. It compelled disclosure of Plaintiff's identity, associates, and creative process and offered to end or curtail the investigation if he removed and then altered the video to include a state-approved disclaimer message. These actions would deter a person of ordinary firmness from engaging in similar protected speech, and they have chilled Plaintiff's speech.

110. The investigation was caused, at least in substantial part, by Plaintiff's criticism of Balint. The close timing, Balint's public complaints, Clark's publicly acknowledged friendship with and political support of Balint, the CID's exclusive focus on Balint, the absence of questions directed to the satire exception or about Coester, and Defendants' failure to make any safety inquiry or law-enforcement referral support that inference.

111. Each Defendant personally participated. On information and belief, Clark directed and authorized the investigation and CID. Welts signed, issued, and pursued the CID. Welts conveyed both the threat of enforcement and fines and the specter of criminal

prosecution, along with an offer that linked relief from the investigation to a change in Plaintiff's speech after its removal. The investigation and CID remain pending, and Defendants have neither withdrawn them nor disavowed future enforcement. Act 75 authorizes a fine of up to $1,000 for an initial knowing and intentional violation or up to $10,000 for a violation within five years after a prior violation. 17 V.S.A. § 2033(a)(1)-(3). Both Clark and Welts acted under color of state law.

112. These allegations state a First Amendment retaliation claim: protected speech, an adverse action, and a causal connection between the two. *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). Government officials may not wield official power to punish or suppress disfavored speech. *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024). The CID's express warnings of civil and criminal punishment and the offer to withdraw it if Plaintiff removed and then changed his speech fit the longstanding prohibition on governmental threats used to suppress protected speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–69 (1963); *Zieper v. Metzinger*, 474 F.3d 60, 65–67 (2d Cir. 2007). The investigation and CID remain ongoing adverse actions. The July 9 stipulation suspends enforcement only while Plaintiff's preliminary-injunction motion remains pending. ECF No. 9 ¶ 2. The pending demand, Defendants' continuing enforcement position, and Act 75's escalating fines continue to chill Plaintiff's future speech.

113. Clark and Welts are liable in their personal capacities for the damages caused by their own retaliatory acts. Plaintiff is entitled to compensatory and nominal damages and all other appropriate relief.

## VII.  Prayer for Relief.

114.  Plaintiff respectfully prays that this Court enter a judgment as follows:

a.  Declaring that Act 75, 17 V.S.A. §§ 2031 through 2033 and 2041 through 2042, is unconstitutional and unenforceable under the First and Fourteenth Amendments to the United States Constitution, both facially and as applied to the Plaintiff;

b.  Declaring that the civil investigative demand in AGO Matter No. 26-SM-101 is unconstitutional, and quashing or enjoining its enforcement;

c.  Awarding a preliminary injunction to protect Plaintiff from enforcement of Act 75 and the CID by Defendants and their officers, agents, and employees while this suit is pending;

d.  Awarding a permanent injunction enjoining Defendants and their officers, agents, and employees from enforcing Act 75 against Plaintiff;

e.  Awarding compensatory and nominal damages against Clark and Welts in their personal capacities;

f.  Awarding Plaintiff's attorneys' fees, costs, and expenses reasonably incurred herein, pursuant to 42 U.S.C. §§ 1983 and 1988 and any other applicable provisions of law, equitable theory, or under the inherent power of the Court; and

g.  Awarding all other relief this Court deems just and proper.

Respectfully submitted, this the 10th day of August 2026,


**TOENSING, LLP**                          **HARDIN LAW OFFICE**

By: /s/ Brady C. Toensing                 By: /s/ Matthew D. Hardin
Brady C. Toensing                         Matthew D. Hardin
1750 H Street NW, Suite 360               101 Rainbow Drive # 11506
Washington, DC 20006                      Livingston, TX 77399
Phone: (202) 297-4245                     Phone: (202) 802-1948
Email: Brady@digtoe.com                   Email: Matt@MatthewHardin.com


*Attorney for Plaintiff*                   *Attorney for Plaintiff*